**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

Janet Burns, Emily Seieroe, Radmila Djordjevic,
Ibrahima Mbaye, Hank Lillevoy, Dai'Ja Spaulding,
Christopher Amparo, Aminata Sam, and Shameely
Azanedo,

                    Plaintiffs,

     - against -

City of New York; Former Mayor Bill De Blasio; Former
NYPD Commissioner Dermot Shea; and Former NYPD
Chief of Department Terence Monahan,

                    Defendants.

-------------------------------------------------------------------- X

Case No. 25-cv-1999

**SECOND AMENDED
COMPLAINT**

**JURY DEMAND**

       Plaintiffs, Janet Burns, Emily Seieroe, Radmila Djordjevic, Ibrahima Mbaye, Hank Lillevoy, Dai'Ja Spaulding, Christopher Amparo, Aminata Sam, and Shameely Azanedo (collectively herein "Plaintiffs"), by and through their attorneys, Beldock Levine & Hoffman LLP; Gideon Orion Oliver; Cohen&Green P.L.L.C.; and Wylie Stecklow PLLC; as and for their Complaint, allege as follows:

### PRELIMINARY STATEMENT

       1.     On May 25, 2020, police killed George Floyd. Almost immediately, protests against police violence and in support of police accountability and the Black Lives Matter movement spread across the United States and the world, including here in New York City where thousands exercised their constitutional rights to protest.

       2.     In the days and weeks following Floyd's killing, the New York City Police Department ("NYPD") engaged in activities that violated the constitutional rights of individuals who were protesting police misconduct, including, *inter alia,* corralling protestors into spaces where they could not escape, beating protestors with batons and fists, throwing protestors to the

ground, using pepper spray indiscriminately, and ultimately arresting many of the protestors without lawful justification and without fair warning. Protestors were physically restrained with flex-cuffs in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage. They were also subjected to lengthy and unnecessary arrest processing that put them in dangerously close quarters, all at the height of the global COVID-19 pandemic.

3.     All of these activities were without lawful justification.

4.     The unlawful policies and practices used by Defendants against protestors included a crowd-control tactic known as "kettling" to corral and detain individuals who were engaged in peaceful protest. Defendants used kettling and similar tactics in order to impede constitutionally protected First Amendment activities, to conduct mass arrests without probable cause, and to deter those arrested and beaten, and others, from exercising their First Amendment rights in the future.

5.     In addition, NYPD officers also targeted and arrested legal observers, medics, and other workers performing essential services without probable cause.

6.     By contrast, these same Defendants have responded to other protests (including, in particular, "Blue Lives Matter" and other pro-police protests) without using the same tactics employed against those who protested police conduct during the racial justice protests of 2020. In other words, it is the *message* of the protest that determines whether Defendants will respond with violent tactics and indiscriminate mass arrests.

7.     The police actions in this case were part of overlapping policies and practices of the City of New York and the NYPD which were well known to Defendants New York City Mayor Bill de Blasio, New York City Police Commissioner Dermot Shea, and other City policymakers. These overlapping policies and practices include, *inter alia,* the use of excessive force, false

2

arrests, and excessive and unreasonable detention at certain demonstrations—particularly those that focus on misconduct by the NYPD—but not others. These overlapping policies and practices have existed for years and have often resulted in litigation. Defendants have acknowledged and admitted to their failures to remedy these unconstitutional policies in recently released reports by, *inter alia,* the New York City Department of Investigation and the New York City Corporation Counsel.[1]

8.      Many of the injuries arising out of the protests were resolved by, among other things, two class actions:  *Sow v. City of New York*, 21-cv-533 (SDNY) and *Sierra v. City of New York*, 20-cv-10291 (SDNY).  This case involves three plaintiffs who fell within the initially defined class in one *Sow*, but outside the class as ultimately certified.  So, they seek redress here on their own.

## JURISDICTION

9.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

10.      The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

---

[1] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

11.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief they pray for herein.

12.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## VENUE

13.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

## TOLLING

14.     As putative class actions, *Sow et al v. City of New York et al*, 20-cv00533(CM)(GWG), *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG), and other suits mentioned below[2] operate to toll any operative statute of limitations as of their date of filing, as to any member of their stated class.  *See generally, American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).

15.     New York state has adopted *American Pipe tolling*, as the Court of Appeals recently noted in *Chavez v Occidental Chem. Corp.*, 35 NY3d 492, 508 (2020).

16.     The COVID-19 executive toll lasted until November 4, 2020 and covered all claims during the summer and fall of 2020. Thus, no days on the statute of limitations for any claims herein had run as of November 4, 2020.

17.     Shortly thereafter, on January 21, 2021, *Sow et al v. City of New York et al*, 20-cv00533(CM)(GWG) was filed, and in the operative complaint, included class action claims for any person arrested or subjected to any force at a protest through at least January 2021.

---

[2] For brevity, Plaintiffs only focus on *Sow* and *Sierra* — since the arguments as to the other class actions would be repetitive and functionally identical.

18.     Thus, those complaints operated to toll any operative statute of limitations as of

their date of filing, through at least the certification of the class. *See generally, American Pipe &*

*Construction Co. v. Utah,* 414 U.S. 538 (1974).

19.     Class certification in *Sow* was granted on February 22, 2024. See *Sow*, Order

Granting Plaintiffs' Motion for Final Approval of Class Action Settlement, ECF No. 196.

20.     The class as defined in the ultimately certified class, however, did not include

Plaintiffs.

21.     Therefore, they neither were paid nor had their claims extinguished by that

settlement.

22.     Plaintiffs were not in privity with any plaintiff in *Sow*, nor the Defendants there.

23.     No class was certified that included any Plaintiff here.

24.     As relevant here, the proposed class in the *Sow* FAC was as follows:

(a) all persons who were targeted for their First Amendment protected activity including
    being, inter alia, unlawfully detained and/or arrested without fair warning or ability to
    disperse, subjected to excessive force, and/or subjected to unreasonably lengthy and
    unsafe custodial arrest processing during the New York City protest marches in
    opposition to police misconduct and in support of police reform from May 28, 2020
    through no earlier than November, 2020 (the "Protests");

(b) all persons who have been or will be unlawfully detained and/or arrested without fair
    warning or ability to disperse since May 28, 2020, pursuant to the NYPD's policy,
    practice, and/or custom of, without legal justification, conducting retaliatory arrests and
    detentions of individuals protesting in opposition to police misconduct and in support
    of police reform.

First Amended Complaint, *Sow v. City of New York*, 21-cv-533, ECF No. 49 ¶ 510 (hereinafter

"Proposed Class").[3]

25.     Plaintiffs were all members of the Proposed Class because, among other things,

---

[3] Plaintiffs were also members of the class defined in the initial complaint.  So, whether by relation back or by two
successive tolls, the period between the initial *Sow* complaint and the *Sow* FAC is included in the toll.

they were each "targeted for their First Amendment protected activity … ***during*** the New York City protest marches in opposition to police misconduct and in support of police reform from May 28, 2020 through no earlier than November, 2020." *Id.* (emphasis added).

26.     Plaintiffs' factual allegations below detail, in depth, how they were (among other things), "unlawfully detained and/or arrested without fair warning or ability to disperse since May 28, 2020, ***pursuant to the NYPD's policy***, practice, and/or custom of, without legal justification, conducting retaliatory arrests and detentions of individuals protesting in opposition to police misconduct and in support of police reform," "targeted for their First Amendment protected activity … ***during*** the New York City protest marches in opposition to police misconduct and in support of police reform from May 28, 2020 through no earlier than November, 2020" (*id.* (emphasis added)).

27.     "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983) (emphasis added).[4]

28.     The Supreme Court has instructed that basic "[p]rinciples of . . . tolling usually dictate that when a time bar has been suspended and then begins to run again upon a later event, the time remaining on the clock is calculated by subtracting from the full limitations period whatever time ran before the clock was stopped." *United States v Ibarra*, 502 U.S. 1, 4 (1991).

29.     "The whole point of American Pipe is to allow unnamed class members to rely on

---

[4] This complaint includes some basic principles of tolling both because (1) the City's motions, pre-motion letters, and positions at meet and confers on similar issues around the *Sow/American Pipe* issues in other cases have failed to grapple with the basics of this law and (2) because in motions, the City has affirmatively *faulted* other Plaintiffs for "mak[ing] vague and conclusory statements regarding why tolling the statute of limitations pursuant to American Pipe is applicable in this case" and apparently for lacking legal argument, saying those plaintiffs' complaints "did not explain why class action tolling is applicable in this case." *Friedland v. City of New York*, 24-cv-7064, ECF No. 26 at 9-10.  Given the City's past demands that a complaint (not a memo) "***explain*** why class action tolling is applicable in this case" (*id.* (emphasis added)), Plaintiffs here do so.

the pending class action in lieu of filing their own protective lawsuits." *Monroe County Emples.' Retirement Sys. v YPF Sociedad Anonima*, 980 F Supp 2d 487, 491-492 (SDNY 2013) (collecting cases and quoting with approval from *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 731 F. Supp. 2d 850, 853 (E.D. Wis. 2010)).

30.     "*American Pipe* does not require bystander plaintiffs …to follow the class action closely, looking for any change in the class definition and carefully parsing what it might mean." *DeGeer v Union Pac. R.R. Co*., 113 F.4th 1035, 1041 (8th Cir 2024).

31.     So, "when a consolidated class action complaint redefines a class more narrowly than the prior individual complaints, and no longer asserts claims on behalf of a portion of the consolidated class, the statute of limitations is ***no longer*** tolled under American Pipe for that 'abandoned' subclass." *In re New Oriental Educ. & Tech. Group Sec. Litig*., 293 FRD 483, 487 (SDNY 2013).

32.     That is, "[w]here the scope of the class definition in an initial complaint 'arguably' includes particular bystander plaintiffs, they remain entitled to *American Pipe* tolling unless and ***until a court accepts a new definition that unambiguously excludes them***." *Defries v Union Pac. R.R. Co*., 104 F.4th 1091, 1099 (9th Cir 2024) (emphasis added); *see also Korwek v Hunt*, 827 F2d 874, 879 (2d Cir 1987).

33.     The date on which *Sow* "redefine[d] [its] class more narrowly" to exclude Plaintiffs and the "court accept[ed that] new definition" was February 22, 2024.

34.     Counting all relevant days, the math is as follows:

| EVENT | DAYS THAT HAVE RUN ON THE STATUTE OF LIMITATIONS |
|---|---|
| 6/01/2020:  Plaintiffs' arrests at the protest. | 0 |
| 11/4/2020:  COVID-19  Toll  expires  and  the | 0 |

| | |
|---|---|
| clock begins running on Plaintiffs' claims.[5] | |
| 01/21/2021: *Sow* Initial Complaint filed.[6] | 71 |
| 03/06/2021: *Sow* FAC filed. | 71 |
| 02/22/2024: Narrowed *Sow* class certified, excluding Plaintiffs; clock begins running again on Plaintiffs' claims. | 71 |
| March 10, 2025: Plaintiffs file their initial complaint in this case. | 453 (or, a bit under a year and a half) |

35.    That is, as set out above, a grand total of just 453 days had run on the applicable 3 year statute of limitations at the time Plaintiffs filed their initial complaint in this case.

36.    453 days is less than 3 years.

## PARTIES

37.    At all times relevant herein, Plaintiff Janet Burns (Ms. Burns; she/her) was a resident of Kings County in the City and State of New York.

38.    At all times relevant herein, Plaintiff Emily Seieroe (Ms. Seieroe; she/her) was, at all relevant times, a resident of New York County in the City and State of New York.

39.    At all times relevant herein, Plaintiff Radmila Djordjevic (Ms. Djordjevic; she/her) was a resident of Kings County in the City and State of New York.

40.    At all times relevant herein, Plaintiff Ibrahima Mbaye (Ms. Mbaye; she/her) was a resident of Kings County in the City and State of New York.

41.    At all times relevant herein, Plaintiff Hank Lillevoy[7] (Mx. Lillevoy; they/them) was a resident of Kings County in the City and State of New York.

---

[5] As Defendants explained in the prior motion to dismiss, "from March 20, 2020 until November 3, 2020," all state statutes of limitations "[were] not merely suspend[ed], but actually tolled." ECF No. 26 at 8. Since the federal § 1983 lifts the state law general tort statute of limitations, that means "the clock on plaintiffs' § 1983 claims started on or about November 4, 2020." *Id.*

[6] As noted above, Plaintiffs were also members of the initially proposed class. *See Sow*, ECF No. 1, ¶ 444. But the just under two months between the initial and SAC in *Sow* do not make any difference.

[7] Mx. Lillevoy previously used a different first name.

42.     At all times relevant herein, Plaintiff Dai'Ja Spaulding (Ms. Spaulding; she/her) was a resident of New York County in the City and State of New York.

43.     At all times relevant herein, Plaintiff Aminata Sam (Ms. Sam; she/her) was a resident of Kings County in the City and State of New York.

44.     At all times mentioned herein, Plaintiff Christopher Amparo (Mr. Amparo; he/they) was a resident of New York County in the City and State of New York.

45.     At all times relevant herein, Plaintiff Shameely Azanedo (Ms. Azanedo; they/them) was a resident of Bergen County in the State of New Jersey.

46.     Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department, and does maintain the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

47.     Defendant New York City Mayor BILL DE BLASIO was at all times relevant to this Complaint, and still is, the Mayor of New York City. As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the "chief executive officer of the city," NYC Charter Section 3, and had final authority to appoint and/or remove the New York City Police Commissioner. He is sued individually and in his official capacity.

48.     Defendant NYPD Commissioner DERMOT SHEA was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with

respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. He is sued individually and in his official capacity.

49.     Defendant NYPD Chief of Department TERENCE MONAHAN was at all times relevant to this Complaint, and still is, the Chief of Department of the NYPD who has policymaking authority over the Department. At all relevant times, as Chief of Department, Defendant Monahan, had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

50.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

51.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

52.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

53.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

54.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

55.     Each individual Defendant is sued in her or his individual and official capacities.

## JURY DEMAND

56.     Plaintiffs demand a trial by jury in this action on each and every one of their claims for which a jury trial is legally available.

## STATEMENT OF FACTS[8]

### Black Lives Matter Protests from May 28, 2020 to May 30, 2020

57.     On May 28, 2020, days after George Floyd's death, protests began across New York City. One protest in Union Square saw a mobilization of hundreds of NYPD officers in response who made several arrests. A group of protestors marched to City Hall where officers trapped them with bicycles, and arrested approximately 75 people.

58.     Protests continued on May 29th at Foley Square in Manhattan and Barclay's Center in Brooklyn. At Barclay's Center, NYPD officers peppered sprayed and struck protesters with batons and hundreds of protestors were arrested.

59.     On May 30, protests continued in New York City in all five boroughs. The protests were again met with NYPD shows of force including pepper spray, baton strikes, fist strikes and mass arrests. In the Flatbush area of Brooklyn, a police helicopter flew low overhead swirling

---

[8] Plaintiffs incorporate by reference the factual allegations in the complaints in related cases *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM), *Wood v. De Blasio et al*, 20-cv-10541 (CM), *Payne et al v. De Blasio et al*, 20-cv-8924 (CM), *Sow et al v. City of New York et al*, 20-cv00533(CM)(GWG) and *Sierra et al v. City of New York et al*, 20-cv-10291 (CM) as well as the facts contained in the reports that have been issued concerning these series of protests, including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigations. *See,* footnote 1 above.

debris, trash, and dust into the marchers' faces. Collectively, at least 321 protestors were arrested following encounters with the Defendants on May 30th.

60.     On May 31, the protests in New York City continued, with thousands marching from the Barclays Center over the Manhattan Bridge into Lower Manhattan, near the Williamsburg Bridge, and in Times Square and Midtown. At least 325 protestors were arrested.

61.     Although there were some instances of property damage and injuries to NYPD officers occurred at some of these protests, the vast majority of the protesters were peaceful and did not engage in property damage. Defendants failed to distinguish protestors from the individuals who damaged property or otherwise violated the law. Defendant Shea acknowledged that those protesting the death of George Floyd and other Black victims of police misconduct in New York were "overwhelmingly . . . good people coming out to voice their opinion." Defendant Monahan also admitted in a public statement that, "the vast majority of people are out there to express their views."

**Defendant de Blasio's Curfew Orders and the NYPD's Subsequent Arrests**

72.     On June 1, 2020, in the midst of the protests in New York City, Governor Andrew Cuomo and Defendant de Blasio announced that New York City would be subject to an 11:00 p.m. to 5:00 a.m. curfew.[9]

73.     On the evening of June 1, 2020, Defendant de Blasio announced he would be extending the curfew to the evening of June 2, 2020 from 8:00 p.m. to 5 a.m.[10]

---

[9] *See* https://www.governor.ny.gov/news/governor-cuomo-and-mayor-de-blasio-announce-citywide-curfew-new-york-city-will-take-effect; Emergency Executive Order No. 117, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf.
[10] *See, e.g.,* https://twitter.com/NYCMayor/status/1267642422194057217?s=20; Emergency Executive Order No. 118, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf.

74.     On June 2, 2020, Defendant de Blasio issued Emergency Executive Order No. 119, ordering "a City-wide curfew to be in effect each day from 8:00 p.m. until 5:00 a.m., beginning at 8:00 p.m. on June 3, 2020 and ending at 5:00 a.m. on June 8, 2020" during which "no persons or vehicles" could "be in public."[11]

75.     Under the Curfew Orders[12]: "Failure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor."

76.     The Curfew Orders specifically targeted those engaged in First Amendment expression, as they exempted certain categories of workers that were deemed "essential", including "police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies."

77.     Pursuant to the Curfew Orders, "any person who knowingly violate[d] the provisions in th[e] Order[s] [was] guilty of a Class B misdemeanor" under NYC Administrative Code § 3-108.

78.     NYC Administrative Code § 3-108 contains a knowing intent requirement: "Any knowing violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both."

---

[11] *See* Emergency Executive Order No. 119, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-119.pdf.
[12] Hereinafter, we refer to Defendant de Blasio's Emergency Executive Orders related to the curfew collectively as the "Curfew Orders."

79.     Under New York Penal Law § 15.05, "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."

80.     On June 1, the NYPD Operations Division issued a FINEST message—an internal message to NYPD members—regarding the curfew orders, instructing officers that "[e]nforcement will only be taken after *several* warnings are issued *and* the violator is refusing to comply." (emphasis added).

81.     On June 2, demonstrations again occurred at multiple locations throughout Manhattan. Protestors encountered NYPD officers in Lower Manhattan, the Upper West Side, Astor Place, Chelsea, and Midtown. More than 290 protesters were arrested at these locations. As occurred in many of the mass arrest locations identified herein, these arrests were made without adequate notice to those engaged in protest and without permitting sufficient time for those who were notified to disperse.

82.     On June 3, another FINEST message omitted the instruction to issue a dispersal order prior to curfew enforcement stating that, for a "person violating the curfew, a C-summons may be issued . . . for violating the Mayoral emergency order."

83.     On June 3, protests again occurred in Brooklyn, at Cadman Plaza and Maria Hernandez Park and in Manhattan, at Midtown East and the Upper East Side near Gracie Mansion. Another 191 protesters were arrested following encounters with NYPD officers at these locations.

84.     On June 4, 2020, protests continued across the City. More arrests were made on this day than any date before.

85.     NYPD officers arrested protesters on June 4 just minutes before, at, or after the 8:00 p.m. curfew in Brooklyn and Manhattan, trapping or kettling (as described above) protesters

and using unreasonable and excessive force against protesters in Midtown Manhattan as well as in Fort Greene and Williamsburg in Brooklyn.

86.    Also on June 4, police in the Mott Haven neighborhood of the Bronx engaged in what Human Rights Watch later called a "planned assault"[13] on a protest against, among other things, police misconduct, trapping protesters on 136th Street before the 8:00 p.m. curfew had expired.

87.    Defendant Monahan was present at the June 4, 2020 Mott Haven demonstration and subsequent kettle, directing, authorizing, and ratifying enforcement actions taken by subordinate NYPD members.

88.    At approximately 7:45 p.m., NYPD Strategic Response Group ("SRG") officers wearing body armor formed a line with their bodies and NYPD bicycles at 135th Street and Willis Avenue, causing protesters who had been proceeding south on Willis Avenue to turn east onto 136th Street.

89.    At or around the same time, NYPD officers formed a police blockade ahead of, and downhill from, the protesters on 136th Street and Brook Avenue. As protesters arrived on the 136th Street block between Brown Place (on the west) and Brook Avenue (on the east, downhill), they were effectively trapped between police lines.

90.    Officers blocked passage on 136th Street between Brown Place and Brook Avenue. A third group of NYPD Officers formed a third police blockade between the 136th Street roadway and the sidewalks to the north and south of 136th Street, effectively preventing people trapped on

---

[13] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States ("HRW Report"), Sept. 2020, *available at* https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states. (Last accessed March 5, 2021).

136th Street between Brook Avenue and Brown Place from going onto the sidewalk, and people trapped on the sidewalk from entering the roadway.

91.    At 8:00 p.m., having kettled the protestors into a space blocking their ability to leave, the NYPD then effectuated mass arrests with heavy use of force for purported violations of the Curfew Orders. The force included striking protesters with batons, deploying pepper spray, and arresting National Lawyers Guild – New York City Chapter Legal Observers, and medical volunteers along with them.

92.    Plaintiffs Bredder, Pluchino, Sow, and Durkee were among the hundreds of people who were trapped on 136th Street by the NYPD's use of the kettling tactic.

93.    In Mott Haven on June 4, and elsewhere throughout the City during the protests, NYPD officers failed to issue dispersal orders allowing for compliance in advance of making arrests for perceived violations of the Curfew Orders.

94.    As protests continued across the City on June 5 and 6, police used almost identical tactics against protestors.

95.    On June 7, 2020, Defendant de Blasio lifted the Curfew Orders—one day earlier than the last of the orders was to remain in effect.

96.    At the time of these arrests, NYPD personnel who were present failed to give clearly communicated dispersal orders and/or provided meaningful opportunities to disperse before trapping or arresting protesters.

97.    While the Curfew Orders were in effect, the NYPD arrested approximately 1,350 individuals, disproportionately Black and minority individuals, for allegedly violating the Curfew Orders.

98.     Upon information and belief, all charged violations of the Curfew Orders related to the protests that are the subject of this litigation were eventually dismissed.

99.     During this series of arrests, police officers routinely failed to distinguish the protesters from individuals taking advantage of the demonstrations to destroy property and steal from businesses.

**NYPD's Permissive Response to Pro-Police and Other, Similar Demonstrations**

100.     The NYPD's violent response to protests against police brutality was dramatically different from their response to other kinds of protests and rallies.

101.     On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[14]

102.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[15]

103.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor

---

[14] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

[15] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[16]

104.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[17]

105.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[18]

106.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[19][20]

---

[16] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[17] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

[18] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[19] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[20] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

107.    The NYPD has a history of treating even right-wing extremists more permissively.

This pattern can be observed from the 1990s to the present.

    a.    In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

    b.    In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[21],[22]

    c.    More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[23] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[24]

### Reports and Investigations into the 2020 Protests

108.    In July 2020, the New York State Office of the Attorney General (the "AG") issued

a preliminary report on the NYPD's response to the May and June protests ("AG Report").[25]

---

[21] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson
[22] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/
[23] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video
[24] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd
[25] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf. The Plaintiffs herein incorporate by reference into this case the facts set forth in the AG Report.

19

109.    The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

110.    The AG Report also found the pervasive use and misuse of tightly fastened flex-cuffs during arrests, NYPD officers covering their badge numbers, and failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

111.    In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[26]

112.    The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[27]

113.    In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[28]

114.    The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

---

[26] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at
https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.
[27] *Id.* at 36.
[28] *Id.* at 61.

115.    The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

116.    The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

117.    According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[29]

118.    The DOI also found that Black arrestees were disproportionately charged with felonies.[30]

119.    The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[31]

120.    According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[32]

121.    In September of 2020, Human Rights Watch issued a detailed analysis of the Mott Haven protest (the "HRW Report") describing the preplanned and coordinated disruption of the march by the NYPD, including by Chief Monahan, who was present at the NYPD mobilization.[33]

122.    The HRW Report describes the systematic kettling of protesters in Mott Haven before the 8:00 p.m. curfew and the subsequent excessive force and mass arrest of the marchers, including National Lawyers Guild – New York City Chapter Legal Observers, as well as medics, all of whom were classified as essential workers exempt from the Mayor's Curfew Orders.

---

[29] *Id.* at 26.
[30] *Id.* at 27.
[31] DOI Report at 56.
[32] *Id.* at 28.
[33] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States ("HRW Report"), Sept. 2020, *available at* https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

123.    Notwithstanding these reports condemning the conduct of the NYPD, following the Mott Haven protest, Defendant Shea ratified the misconduct that occurred when he said the mobilization by the NYPD in Mott Haven was "executed nearly flawlessly."[34]

124.    Defendant City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

### The COVID-19 Pandemic in New York City

125.    As protesters were taking to the streets in the summer of 2020 to speak out against police brutality and in support of Black lives, the COVID-19 virus raged across the country.

126.    In April 2020, Governor Cuomo ordered people to wear protective face masks in public, to protect themselves and others from the spread of the virus.

127.    However, many police officers failed to abide by this directive to wear masks. As the AG Report documented, many officers who interacted with and arrested protesters in May and June of 2020 were not wearing face masks, even as the City continued to record hundreds of new coronavirus cases each week. By contrast, most protesters wore protective face masks—at least until their contacts with NYPD members.

128.    During their arrests, some protesters' masks fell off or were removed. These protesters were transported in vans and/or buses and placed in holding cells in close indoor contact with other arrestees whose masks fell off or were removed, and police officers who were not wearing masks.

---

[34] Jake Offenhartz, Nick Pinto, and Gwynne Hogan, "NYPD's Ambush of Peaceful Bronx Protesters Was "Executed Nearly Flawlessly," City Leaders Agree, Gothamist, June 5, 2020, available at *https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree.*

**Relevant Background from *In re: Policing***

129.    During the course of the consolidated protest litigation in *In re: New York City Policing During Summer 2020 Demonstrations,* 20-cv-8924 (SDNY) ("*In re: Policing*"), the parties focused discovery on a subset of potentially relevant protests by identifying them in a document called "Schedule A" and then an "Amended Schedule A."  *See, e.g., In re Policing,* ECF No. 670 (an order of the Court incorporating "Amended Schedule A").

130.    As relevant here "Amended Schedule A" refers to the version attached to ECF No. 670, since that is an order of the Court.

131.    As relevant here, the parties in *Sow* and *In re: Policing*, at a bare minimum, understood that the *Sow* class covered ***at least*** all protests identified in Schedule A, and then Amended Schedule A.

132.    In fact, the City objected to amending Schedule A based on its understanding that the "Schedule A list of protest locations" was "what we [(e.g., the City) understood] the whole litigation has been based upon this far."

133.    As detailed below, each of the individual Plaintiffs was participating in an Amended Schedule A protest when their claims arose.

**Plaintiffs' Experiences**

***Plaintiff Janet Burns's May 29, 2020 Arrest***

134.    Plaintiff Janet Burns is a 38-year-old freelance journalist specializing in reporting on labor, technology, and social justice.

135.    She has consistently contributed to independent and mainstream news publications for over a decade, including Protest_NYC, Nassau Illustrated News, Forbes, Mental Floss, and AlterNet.

136.    On the afternoon of May 29, 2020, Ms. Burns was lawfully present at a Black Lives Matter protest at and around Barclays Center in Brooklyn, New York.

137.    Among other messages, that protest was in support of police reform and in opposition to police misconduct.

138.    That protest was protest number 3 on Amended Schedule A.

139.    Ms. Burns attended this protest in her capacity as a journalist and wore a press identification lanyard during the duration of the protest.

140.    This lanyard contained her Society of Professional Journalists identification card as well as her Industrial Workers of the World Freelance Journalist press badge and was worn to distinguish her as a member of the working press reporting on the event.

141.    At all relevant times, Ms. Burns's lanyard and badges were clearly visible.

142.    For several hours prior to 5:00 p.m., Ms. Burns recorded videos of the protest occurring around her, including mass arrests, interactions between New York Police Department members and protesters, including shoving and pepper spray use by the NYPD on those in attendance.

143.    At or around 8:00 p.m. or shortly thereafter, Ms. Burns was standing near the side of the Barclays Center facing Flatbush Avenue with a group of fellow protesters.

144.    Without warning, a member of the NYPD approached the group and began indiscriminately spraying the individuals' bodies with pepper spray.

145.    When the officer reached Ms. Burns, he bent over Ms. Burns, and lowered his arm to aim the pepper spray at her bare legs.

146.    The pepper spray left a sticky, orange residue on Ms. Burns' skin and shorts.

147.    Ms. Burns showed her press badges to the officer, at which point the officer left as he ran into a large group of NYPD members.

148.    Shortly after, nearby EMTs provided Ms. Burns with sterile water and encouraged her to rinse the pepper spray off of her legs.

149.    Later that night, after arriving home, Ms. Burns began to experience pain and burns on her legs where the officer pepper sprayed her.

150.    To help alleviate the discomfort, her roommate made a burn compress.

151.    The Defendants' conduct directly and proximately caused physical and emotional injury to Ms. Burns, including, *inter alia*, sustained burning pain, redness, and inflammation of the skin which lasted for several days.

152.    The injuries and stress she sustained at the hands of Defendants resulted in her missing three days of work following the incident to assist in her recovery.

153.    Ms. Burns was arrested/detained unlawfully, and without fair warning or ability to disperse.

154.    Ms. Burns was subjected to excessive force.

155.    Ms. Burns was targeted for her First Amendment protected activity, as detailed above.

156.    Ms. Burns was subjected to NYPD's policies, practices, and/or customs (detailed elsewhere herein) of conducting unlawful arrests and detentions at certain protests.

***Plaintiff Emily Seieroe's May 30, 2020 Arrest***

157.     Ms. Seieroe is a 37-year-old software engineer who has worked as a developer at Honey Co. and Careviso.

25

158.    On May 30, 2020, Ms. Seieroe was lawfully present at a protest and march that she joined in Union Square and continued to march with as it arrived in Times Square around 6:00pm on May 30, 2020.

159.    Among other messages, that protest was in support of police reform and in opposition to police misconduct.

160.    That protest was protest number 16 on Amended Schedule A.

161.    Ms. Seieroe was exercising her First Amendment rights by participating in the march

162.    To protect herself from COVID-19, Ms. Seieroe wore a protective face covering mask.

163.    Members of the NYPD took this protective face mask from Ms. Seieroe while she was in custody.

164.    Upon arrival in Times Square, Ms. Seiroe witnessed significant brutality.

165.    For example, Ms. Seieroe witnessed a number of members of the NYPD police officers grab a young Black person, throw him into a puddle of water and, arrest him.

166.    As this was happening, Ms. Seieroe took out her phone to record the police.

167.    In response to Ms. Seieroe exercising of her right to record, Ms. Seieroe was suddenly surrounded by many members of the NYPD.

168.    While surrounded by the police, she was threatened with violence by a police officer.

169.    She told that officer, "You're scaring me."

170.    Ms. Seieroe was then grabbed my multiple members of the NYPD.

171.    The officers then placed her hands behind her back, took her phone, water, and NYPD Police Officer Christopher Fusco (Tax ID #962416) placed metal handcuffs on her.

172.    The police officers then proceeded to take photos and selfies with her on their personal cell phones.

173.    The handcuffs were placed on her wrists in an extremely tight manner, and the cuffs cut into her wrists.

174.    Ms. Seieroe begged Officer Fusco to loosen the handcuffs.

175.    Eventually, he did eventually.

176.    The police officers placed her inside a van with about 14 other arrestees, including the person that was thrown into the puddle.

177.    That person was now bleeding from his head, but was not provided with any medical attention.

178.    Being in this small space with so many other individuals, having her wrists cuffed so tight and seeing the blood coming from another arrestee caused Ms. Seieroe to have an increased heart rate and increased blood pressure, in a term, she was suffering a panic attack.

179.    Other arrestees in the van sought to calm her down.

180.    Instead of helping, a member of the NYPD (male, white, and about 6' tall) exacerbated the situation by stating, "If you guys keep this up, we're going to drive you straight to Rikers."

181.    Ms. Seieroe was then taken to One Police Plaza, still suffering from the effects of the panic attack.

182.    She was very lightheaded and lacked strength, she fell to her knees as she could no longer stand up.

183.    Numerous times she asked NYPD officers for water and a seat, but her requests were ignored.

184.    Officer Fusco was standing in line with Ms. Seieroe once they arrived at One Police Plaza and made no effort to help her.

185.    Ms. Seieroe did not have her ID on her person

186.    However, a friend was outside One Police Plaza with her photo identification.

187.    Despite this, members of the NYPD outside refused to provide assistance to share the identification with the officers inside.

188.    Inside, while waiting in line for processing, Officer Fusco asked Ms. Seieroe to unlock her cell phone for him so they could send a text to her friend, Quinn, asking for a picture of Ms. Seieroe's ID.

189.    Once her cell phone was unlocked, the text message was sent at 8:24pm.

190.    However, Officer Fusco did not stop with the sending of that single text.

191.    Officer Fusco then proceeded to go through Ms. Seieroe photos and delete the video she took of the police before her arrest.

192.    After she was booked, Officer Fusco ripped Ms. Seieroe's jacket off of her before entering the cell, partially destroying the jacket.

193.    Officer Fusco also removed Ms. Seieroe's shoelaces before she entered the cell but apparently did not properly voucher the laces.

194.    The shoelaces were not returned to her upon release.

195.    Throughout the entirety of her detainment in an overcrowded jail cell and prior being placed in the cell, Ms. Seieroe did not receive any water from the NYPD at her request.

196.     Ms. Seieroe was released from police custody at 3:30am with a dead cell phone and no way to call anyone.

197.     Upon release from jail, Ms. Seieroe reviewed her social media and noticed the arresting officer, Christopher Fusco had been watching her personal Instagram story.

198.     Ms. Seieroe was arrested/detained unlawfully, and without fair warning or ability to disperse.

199.     Ms. Seieroe was subjected to excessive force.

200.     Ms. Seieroe was subjected to unreasonably lengthy, unsafe, custodial arrest processing.

201.     Ms. Seieroe was targeted for her First Amendment protected activity, as detailed above.

202.     Ms. Seieroe was subjected to NYPD's policies, practices, and/or customs (detailed elsewhere herein) of conducting unlawful arrests and detentions at certain protests.

### *Plaintiff Radmila Djordjevic's June 2, 2020 Arrest*

203.     Plaintiff Radmila Djordjevic is a 43-year-old former resident of Kings County with master's degrees in film and in anthropology.

204.     On June 2nd, 2020, Ms. Djordjevic lawfully participated in a peaceful protest march that started on the Brooklyn side of the Manhattan Bridge and walked over the Manhattan Bridge towards Manhattan.

205.     Among other messages, that protest was in support of police reform and in opposition to police misconduct.

206.     That protest was protest number 35 on Amended Schedule A.

207.    On the Manhattan side of the Manhattan Bridge, Ms. Djordjevic decided to turn around and walk back into Brooklyn, leaving through the Brooklyn end of the Manhattan Bridge.

208.    NYPD officers had blocked off the exit to the Manhattan Bridge on the Brooklyn side.

209.    This left Ms. Djordjevic unable to leave the bridge.

210.    At approximately 9:00 p.m., two NYPD officers arrested Ms. Djordjevic near the Manhattan Bridge's Brooklyn exit.

211.    Those officers handcuffed Ms. Djordjevic excessively tightly with flex-cuffs, causing pain in her wrists.

212.    Ms. Djordjevic complained about the tightness of the flex-cuffs and the pain it was causing.

213.    She asked that the handcuffs be loosened.

214.    The officers ignored her request.

215.    The officers had Ms. Djordjevic placed onto a bus to transport her and other arrestees away from the arrest location.

216.    On the transport bus, Ms. Djordjevic asked to put on a medical mask, but NYPD officers ignored her request.

217.    The transport bus brought Ms. Djordjevic to the 79th Precinct, where she was forced to stand in the front hall for hours while arrestees were processed.

218.    The waiting area that Ms. Djordjevic was forced to stand in for multiple hours was extremely crowded and hot and Ms. Djordjevic was still not allowed to wear a protective mask.

219.    Ms. Djordjevic was held at the 79th Precinct overnight and released with a summons for a curfew violation after approximately 12 hours in custody, at or around 9:00 a.m.

220.    The charges against Ms. Djordjevic were later dropped.

221.    The tight flex-cuffs caused pain in Ms. Djordjevic's wrists for several days.

222.    In addition to the physical injuries, Ms. Djordjevic missed two days of work at Vox Media due to the stress of the arrest.

223.    Ms. Djordjevic experienced severe psychological distress from the arrest, which she sought treatment for in therapy.

224.    Ms. Djordjevic was arrested/detained unlawfully, and without fair warning or ability to disperse.

225.    Ms. Djordjevic was subjected to excessive force.

226.    Ms. Djordjevic was subjected to unreasonably lengthy, unsafe, custodial arrest processing.

227.    Ms. Djordjevic was targeted for her First Amendment protected activity, as detailed above.

228.    Ms. Djordjevic was subjected to NYPD's policies, practices, and/or customs (detailed elsewhere herein) of conducting unlawful arrests and detentions at certain protests.

***Plaintiff Ibrahima Mbaye's May 30, 2020 Arrest***

229.    Plaintiff Ibrahima Mbaye is a 25-year-old bartender.

230.    On May 30, 2020, Ms. Mbaye was present at and participated in a protest and march that she joined in Harlem in the early afternoon.

231.    She left the protest to pick up her little sister, but eventually, with her younger sister, re-joined the protest in midtown Manhattan.

31

232.    Among other messages, that protest was in support of police reform and in opposition to police misconduct.

233.    That protest was protest number 15 on Amended Schedule A.

234.    At no point during the protest did either Ms. Mbaye or her sister hear any orders to disperse.

235.    Upon information and belief, no such orders were given.

236.    In the alternative, also upon information and belief, to the extent any orders were given (but not audible), they were not made in a manner designed to be audible, and consistent with longstanding NYPD de facto practice and policy (alleged below and above), no reasonable opportunity to comply was given.

237.    At or around 5:00pm, the march had arrived at 47th Street and 7th Avenue.

238.    Ms. Mbaye, and the protest, was stopped by the NYPD.

239.    Despite wanting to do so, Ms. Mbaye was unable to leave.

240.    Instead, members of the NYPD began mass arrests.

241.    Without cause, warning, or justification, a female NYPD police officer pushed Ms. Mbaye.

242.    In response, Ms. Mbaye asked the officer to keep her hands off of her.

243.    Instead, the same officer pushed Ms. Mbaye again and then placed metal handcuffs on her wrists.

244.    That NYPD officer brought Ms. Mbaye to another NYPD police officer who then loaded Ms. Mbaye onto a transport bus.

245.    The bus was extremely hot, all the windows were closed, and there was no air conditioning on the bus.

246.    Ms. Mbaye was eventually driven to One Police Plaza where she was forced to wait on the bus for approximately two hours.

247.    Once she was removed from the bus, she was then forced to stand in line for another hour.

248.    During this time, a tall white male NYPD police officer, was holding Ms. Mbaye's arm while she stood in line awaiting processing at One Police Plaza.

249.    This officer threatened Ms. Mbaye by telling her that, "if she was nice and polite," she "would be out in a few hours, but if not…" she "could be locked up for months."

250.    After being processed, Ms. Mbaye was placed in an overcrowded cell with over thirty people — in a cell designed for significantly fewer people — with two urinals that made the cell smell like urine.

251.    To protect herself from COVID-19, Ms. Mbaye wore a protective face covering mask to the protest.

252.    However, it was lost when she was arrested.

253.    Ms. Mbaye asked for another mask multiple times.

254.    Ms. Mbaye was never given another facemask during her remaining time in custody, after requesting one multiple times.

255.    The vast majority of the NYPD police officers did not wear facemasks.

256.    Ms. Mbaye was detained in the cell in the conditions described above and elsewhere in this complaint until she was released at around 3:00am.

257.    Upon release, she was given two summonses.

258.    Upon information and belief, those summonses were dropped.

259.    Ms. Mbaye was arrested/detained unlawfully, and without fair warning or ability to disperse.

260.    Ms. Mbaye was subjected to excessive force.

261.    Ms. Mbaye was subjected to unreasonably lengthy, unsafe, custodial arrest processing.

262.    Ms. Mbaye was targeted for her First Amendment protected activity, as detailed above.

263.    Ms. Mbaye was subjected to NYPD's policies, practices, and/or customs (detailed elsewhere herein) of conducting unlawful arrests and detentions at certain protests.

***Plaintiff Hank Lillevoy's May 28, 2020 Arrest.***

264.    Plaintiff Hank Lillevoy is a 42-year-old hairdresser.

265.    On May 28, 2020, Mx. Lillevoy was engaged in First Amendment protected activity when they were present at a protest march that they joined near Union Square on 14th Street near 4th Avenue.

266.    Among other messages, that protest was in support of police reform and in opposition to police misconduct.

267.    That protest was protest number 2 on Amended Schedule A.

268.    That protest was also the second listed protest in the *Sow* class settlement — but Mx. Lillevoy was not a member of the as-certified class, because they were not arrested.

269.    The protest was peaceful.

270.    However, at 4:00pm, without prior warning, NYPD police officers suddenly began using forceful crowd control tactics, specifically, assaulting and shoving protestors with their bikes.

271.    One member of the NYPD, Yuriy Demchenko (Tax ID# 946912), violently assaulted Mx. Lillevoy with his NYPD bicycle multiple times, by lifting the bike up at his head height and over his head and shoving and smashing the bicycle upon Mx. Lillevoy's head, torso, legs, and arms.

272.    Officer Demchenko was assisted by NYPD Captain John L. O'Connell (Tax ID# 937204).

273.    Captain O'Connell ratified and supported Officer Demchenko's assault.

274.    Officer Demchenko pushed Mx. Lillevoy into – and over – a concrete barrier.

275.    The assault caused substantial bruising upon Mx. Lillevoy's arm and leg.

276.    Mx. Lillevoy was not ultimately subjected to a custodial arrest.

277.    The violent assault by multiple members of the NYPD caused Mx. Lillevoy physical and non-physical injuries.

278.    Mx. Lillevoy was detained unlawfully, and without fair warning or ability to disperse.

279.    Mx. Lillevoy was subjected to excessive force.

280.    Mx. Lillevoy was targeted for their First Amendment protected activity, as detailed above.

281.    Mx. Lillevoy was subjected to NYPD's policies, practices, and/or customs (detailed elsewhere herein) of conducting unlawful arrests and detentions at certain protests.

***Plaintiff Dai'Ja Spaulding's May 30, 2020 Arrest.***

282.    Plaintiff Dai'Ja Spaulding has a BA from Northeastern University and works full time as a project manager.

35

283. On May 30, 2020, Ms. Spaulding was lawfully present at a peaceful protest in Harlem at or around 125th Street.

284. Among other messages, that protest was in support of police reform and in opposition to police misconduct.

285. That protest was protest number 15 on Amended Schedule A.

286. Ms. Spaulding stayed with the march as it proceeded south.

287. The protest reached 42nd Street Times Square at or around 6:00 p.m.

288. At that place and time, it was met by a large group of NYPD officers.

289. Without providing Ms. Spaulding or other protesters meaningful notice and an opportunity to disperse, members of the NYPD began to push and/or corral protesters, including Ms. Spaulding.

290. Ms. Spaulding was standing still a member of the NYPD approached her and threw her to the ground.

291. That member of the NYPD applied zip-tie handcuffs with extreme tightness.

292. As that officer was cuffing Ms. Spaulding, multiple other officers approached.

293. Ms. Spaulding complained about the tightness of the flex-cuffs and asked that they be loosened or changed.

294. These complaints and requests were ignored.

295. As Ms. Spaulding was being loaded into a transportation vehicle, she again requested that her handcuffs be loosened but was told there was nothing that could be done.

296. Upon information and belief, that was in part because of NYPD's informal policy and practice, detailed elsewhere herein, of not providing officers heading to mass arrests with the tools to remove or loosen the zip-tie handcuffs used for such arrests.

297.    NYPD officers drove the arrestees around the area, essentially in a circle, ultimately ending up back at Times Square.

298.    After approximately 40 minutes, all arrestees, including Ms. Spaulding, were loaded off this transportation vehicle and onto a bus.

299.    Thereafter, on the bus, Ms. Spaulding was brought to a mass arrest location downtown.

300.    Once inside the building, her flex-cuffs were finally removed.

301.    That removal revealed that the cuffs had cut into her skin and Ms. Spaulding was bleeding from her wrists.

302.    Ms. Spaulding was searched, photographed and then placed in a cell.

303.    At no point was Ms. Spaulding offered a phone call, food, or water.

304.    At approximately 11:30 p.m., Ms. Spaulding was issued a summons.

305.    Ms. Spaulding was then released from custody.

306.    Approximately 3 months later, in August 2020, Ms. Spaulding received a letter informing her that her charges were dismissed.

307.    The conduct of the Defendants directly and proximately caused Ms. Spaulding to suffer physical injuries including, *inter alia*, bruising, swelling, and bleeding of the wrists.

308.    Ms. Spaulding was arrested/detailed unlawfully, and without fair warning or ability to disperse.

309.    Ms. Spaulding was subjected to excessive force.

310.    Ms. Spaulding was subjected to unreasonably lengthy, unsafe, custodial arrest processing.

311.    Ms. Spaulding was targeted for her First Amendment protected activity, as detailed above.

312.    Ms. Spaulding was subjected to NYPD's policies, practices, and/or customs (detailed elsewhere herein) of conducting unlawful arrests and detentions at certain protests.

***Plaintiff Aminata Sam's June 5, 2020 Arrest.***

313.    Plaintiff Aminata Sam has an undergraduate degree from Brooklyn College, attended a virtual venture program at Harvard Business School, and received her Masters of Business Administration in Real Estate.

314.    She is a businesswoman working as a real estate developer.

315.    In the early afternoon of June 5, 2020, Ms. Sam was lawfully present at a peaceful protest near the Brooklyn Museum.

316.    Among other messages, that protest was in support of police reform and in opposition to police misconduct.

317.    That protest was protest number 52 on Amended Schedule A.

318.    Members of the NYPD unlawfully arrested Ms. Sam in violation of, and retaliation for the exercise of, Ms. Sam's rights.

319.    At approximately 8:00 p.m., on the corner of Montgomery Street and Nostrand Avenue, NYPD officers began to encircle protesters into a space.

320.    By using an encirclement technique, those members of the NYPD blocking protesters' ability to leave.

321.    One by one, NYPD Officers began to arrest each protester, placing flex-cuffs on each protester as they were arrested.

322.    Two members of the NYPD arrested Ms. Sam and applied the flex-cuffs with extreme tightness, causing significant pain in both of Ms. Sam's hands and wrists.

323.    Ms. Sam complained about the tightness, discomfort and pain caused by the flex-cuffs.

324.    The officers ignored these complaints of pain.

325.    Officers loaded Ms. Sam into a prisoner transport vehicle.

326.    Ms. Sam was held inside this vehicle for approximately 2 hours before it left the location.

327.    Ms. Sam asked the officers to make a phone call, but this request was ignored.

328.    Ms. Sam continued to request that her flex-cuffs be loosened but officers ignored her request.

329.    Ms. Sam was then transported to the 71st precinct where she remained in extremely tight flex-cuffs for another hour.

330.    She was photographed, fingerprinted, and searched.

331.    Thereafter, Ms. Sam was placed in a cell with approximately nine other people and her flex-cuffs were finally removed.

332.    Ms. Sam had marks on her wrists from the flex-cuffs hours after they were removed.

333.    After approximately 2 hours in custody, at around 1:00 a.m. on June 6, 2020, Ms. Sam was issued a summons for curfew violation and released from custody.

334.    Ms. Sam's charges were eventually dismissed.

335.    As a result of this incident, Ms. Sam was forced to leave her position as a private equity tax intern at PriceWaterhouseCoopers.

336.    The conduct of the Defendants directly and proximately caused Ms. Sam to suffer physical, emotional, and financial injuries, including, *inter alia*, painful wrists, a fear of the police, and loss of employment.

337.    Ms. Sam was arrested/detained unlawfully, and without fair warning or ability to disperse.

338.    Ms. Sam was subjected to excessive force.

339.    Ms. Sam was subjected to unreasonably lengthy, unsafe, custodial arrest processing.

340.    Ms. Sam was targeted for her First Amendment protected activity, as detailed above.

341.    Ms. Sam was subjected to NYPD's policies, practices, and/or customs (detailed elsewhere herein) of conducting unlawful arrests and detentions at certain protests.

### Plaintiff Christopher Amparo's May 30, 2020 Arrest.

342.    At the relevant time, Plaintiff Christopher Amparo was a part-time college student at Guttman Community College in Manhattan.

343.    On or around May 30, 2020, Mr. Amparo was lawfully present at a protest that began on the West side of 125th Street and proceeded lawfully south in Manhattan.

344.    Among other messages, that protest was in support of police reform and in opposition to police misconduct.

345.    That protest was protest number 15 on Amended Schedule A.

346.    Among other messages, that protest was in support of police reform and in opposition to police misconduct.

347.    The protest reached 42nd Street Times Square when it was met by a large group of NYPD officers.

348.    Without first providing protestors (including Mr. Amparo) meaningful notice and an opportunity to disperse, members of the NYPD began to push and/or corral protesters.

349.    At or around 3:30 p.m., members of the NYPD grabbed Mr. Amparo by the wrists so hard so as to cause bruising and swelling.

350.    Members of the NYPD threw Mr. Amparo onto the ground and surrounded him.

21.

351.    Members of the NYPD then picked him up and placed excessively tight zip-tie handcuffs on him.

352.    Mr. Amparo complained about the tightness of the flex-cuffs and requested that they be loosened or replaced.

353.    The complaint was ignored and the flex-cuffs were not loosened or replaced.

354.    Members of the NYPD then searched Mr. Amparo and found his identification which indicated that he was (at the time) underaged.

355.    Despite this fact, NYPD Defendants placed him in a transport vehicle with women.

356.    He was then transported to a precinct on the Lower East Side, where he remained for approximately two hours.

357.    Thereafter, NYPD Defendants took him to another precinct and only then finally removed his handcuffs.

358.    At around 10:00 p.m. on May 30, 2020, Mr. Amparo was issued a summons and released from custody.

359.    Mr. Amparo was subjected to the policies and practices alleged elsewhere herein because of his participation in the protest.

360.    The conduct of the Defendants directly and proximately caused Plaintiff to suffer physical, and emotional injuries including, inter alia, bruising and swelling of the wrists and anxiety.

361.    Mr. Amparo was arrested/detained unlawfully, and without fair warning or ability to disperse.

362.    Mr. Amparo was subjected to excessive force.

363.    Mr. Amparo was subjected to unreasonably lengthy, unsafe, custodial arrest processing.

364.    Mr. Amparo was targeted for his First Amendment protected activity, as detailed above.

365.    Mr. Amparo was subjected to NYPD's policies, practices, and/or customs (detailed elsewhere herein) of conducting unlawful arrests and detentions at certain protests.

***Plaintiff Shameely Azanedo's November 5, 2020 Arrest.***

366.    Plaintiff Shameely Azanedo is a 43-year-old resident of Hasbrouck Heights, New Jersey.  She works as a store manager at a Lenscrafters store.

367.    On November 5, 2020, Ms. Azanedo was lawfully present at and attending a Black Trans Liberation protest and march near the Stonewall Inn in Manhattan, New York.

368.    Among other messages, that protest was in support of police reform and in opposition to police misconduct.

369.    That is, police reform and an end to police misconduct is a necessary part of Black Trans Liberation.

42

370.    Indeed, the location of the protest — at the Stonewall Inn — demonstrates the integral connection between the two:  Stonewall was the site of endless NYPD misconduct and discrimination specifically aimed at trans (and especially Black trans) New Yorkers, and the Stonewall Riots, where those New Yorkers fought back against the rampant police misconduct and corruption that particularly plagued trans, gay, lesbian, queer, and bi New Yorkers marked the beginning of the modern Pride movement.[35]

371.    That protest was protest number 79 on Amended Schedule A.

372.    Starting at or around 8:00 p.m., members of the NYPD encircled protesters.

373.    Ms. Azanedo did not hear any orders to disperse.

374.    Upon information and belief, no such orders were given.

375.    In the alternative, also upon information and belief, to the extent any orders were given (but not audible), they were not made in a manner designed to be audible, and consistent with longstanding NYPD de facto practice and policy (alleged below and above), no reasonable opportunity to comply was given.

376.    Ms. Azanedo began to record an officer — an Officer Ruiz, based on his badge — with her phone.

377.    Officer Ruiz reacted to Ms. Azanedo's exercise of her right to record police by shoving her and pushing her phone into her chest.

378.    Officer Ruiz then slammed her into the ground and pinned her to the ground.

379.    Officer Ruiz then repeatedly punched Ms. Azanedo in the stomach and face.

380.    Officer Ruiz then grabbed her arms and placed them behind her back.

---

[35] This context is provided in part because the attorneys for the City of New York argued in the pre-amendment meet and confer that, somehow, a protest about "Black Trans Liberation" had nothing to do with "police reform" or "police misconduct."  While the claim was absurd — particularly given that the protest was, of all places, at Stonewall — the assertion needed to be addressed.

381.    Ms. Azanedo did not resist arrest but the officer kept punching her in face so she grabbed her hand away from his grasp in order to protect her face.

382.    In response, he told her to stop resisting.

383.    Ms. Azandedo was not resisting — only trying to block punches to her face.

384.    Ms. Azanedo was then transported, with other protesters, to 1 Police Plaza.

385.    At 1 Police Plaza, members of the NYPD deleted the video Ms. Azanedo had taken of Officer Ruiz before returning her phone to her.

386.    After several hours, at or around 1:30 to 2:00 a.m., Ms. Azanedo was released with a Desk Appearance Ticket.

387.    The DA declined to prosecute the DAT, and the case was dismissed.

388.    Because she could not bend her legs the next day, Ms. Azandedo went to the emergency room for treatment.

389.    Ms. Azanedo suffered significant physical and emotional injuries, including, but not limited to cuts, bruises, inflammation, scars on her shins, scratches and bruising on her face, inability to bend her knees the next day, impact on work performance, and ongoing trouble sleeping.

390.    Ms. Azanedo was arrested/detailed unlawfully, and without fair warning or ability to disperse.

391.    Ms. Azanedo was subjected to excessive force.

392.    Ms. Azanedo was subjected to unreasonably lengthy, unsafe, custodial arrest processing.

393.    Ms. Azanedo was targeted for her First Amendment protected activity, as detailed above.

394.    Ms. Azanedo was subjected to NYPD's policies, practices, and/or customs (detailed elsewhere herein) of conducting unlawful arrests and detentions at certain protests.

### The NYPD's History of Mishandling Certain Protests

395.    The extensive deprivations of constitutional rights suffered by Plaintiffs during the 2020 protests are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia*, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

396.    The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

397.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[36]

---

[36] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), *available at* https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.

398.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention.[37]

399.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[38]

400.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers, as well as kettling tactics to move protestors or initiate mass arrests.[39]

401.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

402.    Following NYPD conduct during these and other protests, the City of New York and the NYPD its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as have the Plaintiffs in this case.

403.    In many of these cases Defendants employed tactics developed and modified over the course of many years by Defendants Shea, Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a.    *Mandal v. City of New York.*, 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the

---

[37] *See, e.g.*, N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[38] *See, e.g., Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[39] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.  *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c.  *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.  *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.  *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight

plastic handcuffs in their arrest;

f.  *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz*, 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.  *Callaghan v. City of New York*, 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.  *Osterhoudt v. City of New York, et al.*, No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.  Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[40] there were more than

---

[40] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.      In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[41] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.      Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

l.      The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.      The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

---

[41] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

n.     Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well *as* several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o.     The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

p.     The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

q.     The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.     *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

**The NYPD's Failure to Train Regarding Protest Policing**

404.    Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

405.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

406.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

407.    Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

408.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

409.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

410.    These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of Plaintiffs in this case.

411.    Upon information and belief, Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

412.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

413.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as

how to make probable cause determinations or the requirements of providing an alternative avenue

of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

438.    Defendants' failures to train, which led to violations of Plaintiffs' rights in this case,

include, *inter alia,* the following:

a.    The failure to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

b.    The failure to make clear the need for individualized probable cause to arrest in a protest context;

c.    The need failure to provide training on the need for fair warning and a meaningful opportunity to comply with police directions as a prerequisite for probable cause to arrest for a Curfew Order violation;

d.    The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

e.    The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters;

f.    The failure to provide training on the proper application and removal of flex-cuffs, including how to measure the appropriate tension on flex cuffs; how to assess the need to remove flex-cuffs; how long flex-cuffs may be worn before a significant risk of nerve damage develops; the safest types of flex-cuffs to use (for example, flex-cuffs with a double-locking feature and padding); the safest types of removal equipment to use and how to use removal equipment properly so as not to accidentally tighten flex-cuffs further in the process of removal; and other topics related to the use of flex-cuffs; and

g.    The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other, similar safety measures in light of the COVID-19 pandemic.

414.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

415.    The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

416.    The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

417.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[42]

418.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

419.    Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[43]

420.    SRG members are meant to have additional DCU training.

421.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

---

[42] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns*, Gothamist, Jan. 30, 2015, *available at* https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.
[43] Ali Winston, *NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct* Histories, The Appeal, Oct. 15, 2020, *available at* https://theappeal.org/nypd-srg-misconduct/.

422.    However, many of the officers deployed to respond to the protests in 2020 did not even receive *that* training, which was supposedly required of them.

423.    As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."[44]

424.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

425.    Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

426.    For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF

---

[44] OCC Report at 37.

after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY).[45]

427.    Those reports praised employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

428.    After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

429.    For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after-action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

430.    Nevertheless, upon information and belief, at all times relevant herein, Defendants de Blasio, Shea, Monahan, and other defendant City policymakers, routinely received reports regarding arrests made in connection with First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in

---

[45] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

431.    Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

432.    For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

433.    As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

434.    For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b)(6) witness designated to testify on sidewalk policy protesting, dispersal orders, and training on probable cause standards for crimes commonly charged in protest policing by the Defendant City could identify no impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training.

435.    Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[46]

---

[46] OCC Report at 2, 30.

436.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates both a history and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiffs and other similarly injured protesters.

**The NYPD's Policy and/or Practice
of Using Excessive Force to Control the Speech of Protestors**

437.    Defendants used types and levels of force that were excessive and unnecessary force against the Plaintiffs and other similarly situated protestors.

438.    In many cases, those uses of force were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

439.    In many cases, Defendants failed to document, and/or require that fellow Defendants and/or other fellow officers document, uses of force in accordance with related NYPD policies and/or training.

440.    In many cases, Defendants used force against Plaintiffs based on their position in or proximity to a perceived group, without first having given the perceived group clearly communicated prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

441.    In many cases, Defendants used types of force, such as deploying pepper spray, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate

determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

442.    Additionally, Plaintiffs and others arrested at the protests that are the subject of this litigation were handcuffed with their wrists together and their hands behind their back with plastic flex-cuffs.

443.    In many cases, Plaintiffs and/or other arrestees complained about the fact that their flex-cuffs were too tight and/or causing them injury.

444.    Specifically, because they were arrested at a protest, Plaintiffs were subjected to flex-cuffing pursuant to Defendants' Protest Arrest Processing Policies, in connection with which Defendant City did not supply Defendants with enough of cutting tools with which to loosen or remove flex-cuffs, or *any* flex-cuff pads, which are designed to prevent the very types of injuries Plaintiffs and other arrestees suffered as a result of having flex-cuffs applied to them.

445.    It was no secret to Defendants that using flex-cuffs to restrain protesters— including without providing adequate numbers of cutting tools or any protective padding—would result in injuries to protesters, of the sort that appropriate policies, training, and/or supervision would have avoided.

446.    For example, *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) was a class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, the NYPD's then-policy and practice of using plastic flex cuffs as "unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed."

447.    Plaintiffs in *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police

58

responses to protests on April 7, 2003, also raised *Monell* claims around NYPD members' use of extremely tight, plastic handcuffs.

448.    Additionally, in *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.), the Court certified a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs." *See MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011).

449.    Those cases, and many others, challenged the City's and NYPD's policies and practices regarding the use of flex-cuffs to restrain protesters, and put the Defendants in this case on notice of the

450.    Relatedly, the DOI Report found, "When voicing those concerns to their arresting officers or other officers in the area, arrestees were told that the officers lacked the necessary equipment to remove the flex-cuffs. Arrestees therefore had to wait, oftentimes for long periods, until they got to their respective arrest processing center so that flex-cuffs could be removed."[47]

**Defendants' Policies and Practices**
**Regarding Arrests—Including Mass Arrests—Without Fair Warning**

451.    In many cases, Defendants seized Plaintiffs based on the perception that they were part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff in question based on their own, individual conduct, as opposed to the perceived "group conduct."

452.    In many cases, Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

---

[47] *See, e.g.,* DOI Report at 42. *See also,* AG Report at 29 ("Officers kept the [flex-cuffs] on their wrists even after they were placed in cells, which, for some, cut off their circulation or caused other injuries to their wrists, including cuts and nerve damage.").

453.    For example, with respect to Plaintiffs who were arrested in connection with perceived violations of Defendant de Blasio's Curfew Orders, or for perceived violations of New York Penal Law § 240.20(6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order), Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests, and/or ensure that each such arrested Plaintiff had the state of mind required for such arrest.

454.    With respect to Defendant de Blasio's Curfew Orders, the plain language of Defendant de Blasio's Curfew Orders required both (a) a knowing violation of the Executive Order prior to any arrest *and* (b) that any arrest could only follow a dispersal order, a meaningful opportunity to disperse, and a person's refusal to comply with the order.

455.    As pleaded elsewhere herein, Defendants enforced the Curfew Orders by arresting Plaintiffs and other protesters without first ensuring that they had been given dispersal orders, meaningful opportunities to disperse, and refused to comply, under circumstances in which they had not ensured that arrestees had knowingly violated the Curfew Orders.

456.    That enforcement was consistent with official NYPD policy.

457.    For example, in a September 16, 2020 letter from NYPD Deputy Commissioner of Legal Matters Ernest F. Hart to Ida Sawyer, Acting Crisis and Conflict Director, Human Rights Watch,[48] Deputy Commissioner Hart stated that officers who merely "observed individuals who were not essential workers in public…[t]hat observation provided officers with probable cause to take, at a minimum, enforcement for Administrative Code § 3-108, Violating a Mayoral Executive Order, a 'B' Misdemeanor."

---

[48] Available at https://www.hrw.org/sites/default/files/media_2020/09/Annex%20II_0.pdf.

458.    Additionally, in many cases, Defendants enforced other provisions of New York law against Plaintiffs and other perceived protesters without probable cause and/or without first having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

459.    For example, with respect to Plaintiffs who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind required for such arrest.

460.    By way of further example, with respect to Plaintiffs who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested Plaintiff had notice that they were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

461.    Defendants enforced provisions of New York law against Plaintiffs that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with – for example, VTL § 1156(a), which involves walking along or upon a roadway when an adjacent and usable sidewalk is available – the equivalent of jaywalking, an everyday offense that Defendants all but ignore in the City.

462.    In many cases, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiffs and other perceived protesters, including by kettling, without first having given Plaintiffs and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse

or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

463.    Plaintiffs amount an as-applied, First Amendment-based challenges to the application of NYC Administrative Code § 3-108; PL §§ 240.20(5) and/or 240.20(6); and/or VTL § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

**Defendants' Protest Arrest Processing Policies and Practices**

464.    Beyond that, in many cases, Defendants arrested Plaintiffs for alleged offenses which New York Criminal Procedure Law § 150.20 required them to grant Plaintiffs summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

465.    However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Plaintiffs and other arrestees in flex-cuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-scale arrest processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

466.    Additionally, as a result, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiffs to flex-cuffing as well as unreasonably lengthy, onerous arrest

processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, as well as searches of their persons and property, and/or seizures and/or retentions of their property without adequate pre- or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining the property.

467.    In some cases, NYPD members destroyed and/or damaged property belonging to Plaintiffs and other arrestees.

468.    In other cases, NYPD members seized and retained property from Plaintiffs and other arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property seized by NYPD members.

469.    In still other cases, NYPD members seized and retained property without providing Plaintiffs with a meaningful opportunity to retrieve it, for example because the location at which Defendants were retaining the property was closed.

470.    The conditions of confinement were unsafe and overcrowded, particularly in the context of the COVID-19 pandemic, and/or filthy and/or unsanitary; and lacked appropriate access to phone calls, food, water, bathrooms soap and/or hand sanitizer, other hygienic products such as tampons, and/or other basic necessities.

471.    With particular respect to the COVID-19 pandemic, during Plaintiffs' confinements, the State of New York, and Defendant City, had advised people to comply with social distancing, to wear masks, and to engage in practices such as hand-washing; and Defendant City, as well as Defendants Shea, Monahan, and other NYPD members, enforced Executive Orders issued by Mayor de Blasio requiring people to engage in social distancing and/or mask-wearing, all on an emergency basis.

472.    However, as part of Defendants' Protest Arrest Processing Policies and MAPP, instead of detaining Plaintiffs and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants transported Plaintiffs to a MAPC or other centralized arrest processing location, in close, forced proximity to other arrestees and NYPD members, many of whom were not wearing masks, rendering social distancing impossible.

473.    Relatedly, many Defendants and other nearby NYPD members were not wearing masks while arresting and/or using force on and/or detaining Plaintiffs.

474.    Also relatedly, Defendants and other NYPD members removed masks many Plaintiffs and other arrestees who had masks at one point prior to or during their arrests or detentions.

475.    Also as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiffs and other arrestees to conditions of confinement in which they were unable to wash their hands or otherwise engage in other, similar hygienic practices that the State and City were recommending for public health and safety.

476.    Defendants knew or should have known that, as a result of subjecting Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP, they would deprive Plaintiffs and other arrestees of basic needs, including for example the need to stay safe from COVID-19, as well as unreasonable risks of serious damage to their physical and/or mental health or safety through potential exposure to COVID-19.

477.    Defendants acted intentionally to impose those conditions because they subjected Plaintiffs and other arrestees to Defendants' Protest Arrest Processing Policies and MAPP.

478.    Additionally, Defendants recklessly failed to act with reasonable care to mitigate the risks that the conditions posed even though they knew or should have known that they posed

excessive risks to Plaintiffs' physical and/or mental health or safety through potential exposure to COVID-19.

479.    Moreover, the risks were obvious and apparent, including based on the State and City policies and practices related to COVID-19 safety, and common sense.

**Defendants' Failure to Monitor and Supervise NYPD Members' Protest Policing**

480.    Although Defendants City, de Blasio, Shea, Monahan, and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

481.    For example, despite statements made by Defendants de Blasio and Shea in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and the wealth of video and other evidence that has been widely available in the intervening months, upon information and belief, virtually no NYPD members have been meaningfully investigated or disciplined related to their conduct.

**DEFENDANTS' IMPOSED RESTRICTIONS**

482.    Defendants (a) imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in falsely arresting Plaintiffs, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, in subjecting Plaintiffs to Defendants' Protest Arrest Processing Policies, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

483.    In addition to being retaliatory, the restrictions Plaintiffs complain of herein, which Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe, and/or stand

nearby speech, conduct, association, and/or other expressive activities protected by the First

Amendment on the streets, were themselves regulations on Plaintiffs' protected conduct that:

    a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

    b.    Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiffs' protected expression, including in that Plaintiffs' abilities to communicate effectively were threatened; and/or

    c.    Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

    d.    Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

## FIRST CLAIM FOR RELIEF[49]
### Unlawful Seizure / False Arrest
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

484.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

485.    Defendants' seizure of the Plaintiffs herein was done without any judicial warrant authorizing then to seize any Plaintiff was unreasonable and was done without privilege or lawful justification,

486.    Plaintiffs did not consent and were conscious of their confinements by Defendants.

---

[49] The majority of the claims alleged in this complaint are *Monell* claims against the City. In order to better track the claims in *Sow* and *Sierra*, this complaint alleges the underlying substantive constitutional violations before alleging the policies that caused them, even if the underlying claim does not have a corresponding individual defendant and the sole claim is against the City through *Monell*.

487.    Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiffs.

488.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF
**Excessive Force**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

489.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

490.    Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

491.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

492.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF
**First Amendment**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

493.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

494.    In committing the acts and omissions set forth herein, the Defendants acted under color of state law, individually and in concert, without lawful justification to deprive Plaintiffs of their rights to speech, expression and to assemble in violation of the First, Fifth, and Fourteenth Amendments to the United States.

495.    As a result of the foregoing, Plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses and were otherwise damaged and injured.

496.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FOURTH CLAIM FOR RELIEF
**First Amendment Retaliation**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution*

497.    Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

498.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

499.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

500.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

501.    Additionally, as discussed elsewhere herein, Defendants City, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of the First Amendment rights.

502.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

503.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiffs.

504.    Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiffs in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

505.    Additionally, the offenses charged against Plaintiffs, which Defendants might argue provided probable cause for Plaintiffs' arrests, were all offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

506.    Each Plaintiff suffered actual chill in that each Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

507.    Additionally, in many cases, Defendants apparently permitted, acquiesced in, and/or facilitated the speech and/or other expressive conduct in which Plaintiffs were engaging, before suddenly using force and/or making arrests, without first having given reasonable notice that such force and/or arrest activity would result if Plaintiffs did not conduct themselves differently and/or disperse, as well as a meaningful opportunity to comply.

508.    Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Plaintiffs subjected Plaintiffs to the violations of their First Amendment rights described elsewhere herein.

509.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

**FIFTH CLAIM FOR RELIEF**
**Due Process**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution*

510.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

511.    In addition to the Due Process violations described above, Plaintiffs hereby mount an as-applied, Due Process-based challenge to the application of NYC Administrative Code § 3-108; PL §§ 240.20(5) and/or 240.20(6); and/or VTL § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

512.    As described above, Defendants enforced offenses, including the Curfew Orders and NYC Administrative Code § 3-108; PL §§ 240.20(5) and 240.20(6); and VTL § 1156(a), in a

manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

513.    Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiffs' property and/or detaining Plaintiffs in the conditions as described subjected Plaintiffs to the violations of their Due Process rights described elsewhere herein.

514.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

## SIXTH CLAIM FOR RELIEF
### Equal Protection and Selective Enforcement
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourteenth Amendment to the United States Constitution*

515.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

516.    Plaintiffs hereby mount an as-applied, Equal Protection-based, selective enforcement challenge to the application of NYC Administrative Code § 3-108; P.L. §§ 240.20(5) and/or 240.20(6); and/or V.T.L. § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

517.    Additionally, as described above, in many cases, Defendants arrested Plaintiffs for alleged offenses in connection with which C.P.L. § 150.20 required that Plaintiffs receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

518.    However, because Defendants arrested Plaintiffs and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, rather than issuing them summonses, and releasing them from custody, on the street, while Defendants did not apply those same Protest Arrest Processing Policies to other similarly situated arrestees.

519.    Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and/or detaining and/or prosecuting Plaintiffs subjected Plaintiffs to the above-described violations of Plaintiffs' Equal Protection rights.

520.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

**SEVENTH CLAIM FOR RELIEF**
**Municipal Liability**
***Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)***
***for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth***
***Amendments to the United States Constitution***
*On behalf of Plaintiffs against Defendant City of New York, Defendant Bill de Blasio, Defendant*
*Dermot Shea, and Defendant Terence Monahan*

521.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding
and following paragraphs as if fully set forth herein.

522.    The facts pleaded above describe the policies, practices, and customs Defendants
subjected Plaintiffs to, including, but not limited to: uses of excessive force, and false arrests, and
unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair
warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise
trapping protesters, without fair warning; engaging in retaliatory and selective enforcement of the
Curfew Orders and other violations against perceived participants in First Amendment assemblies,
particularly Black Lives Matter and/or anti-police brutality protests, in the absence of adequately
clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim,
based on *ad hoc* determinations as to their perceived violations, without fair warning; using flex-
cuffs for protest-related arrests, while failing to supply officers with protective padding and
adequate numbers of cutting tools to loosen or remove flex-cuffs, while and/or to ensure that such
cutting tools are readily available when needed; failing to loosen or remove over-tight cuffs; and
subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at
centralized arrest processing locations, exposing them to searches, property seizures, and
unhealthy and conditions of confinement, in lieu of brief street detentions.

523.    All of the wrongful acts or omissions complained of herein were carried out by the
individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules,

and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio, Defendant Shea, and Defendant Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

## DEMANDS FOR RELIEF

**WHEREFORE**, Plaintiffs demand the following relief against the Defendants:

a.  Award Plaintiffs compensatory and punitive damages (against the individual Defendants) in amounts that are fair, just and reasonable, to be determined at trial;

b.  Award Plaintiffs reasonable attorneys' fees and costs; and

c.  Grant such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

[Signatures on Following Page]

74

Dated: July 23, 2025
     New York, New York

**BELDOCK LEVINE & HOFFMAN LLP**

By: _____

    Jonathan C. Moore
    David B. Rankin

99 Park Avenue, PH/26th Floor
New York, New York 10016
    t: 212-490-0400
    f: 212-277-5880
    e: jmoore@blhny.com
       drankin@blhny.com

**WYLIE STECKLOW PLLC**

_____

By: Wylie Stecklow
Wylie Stecklow PLLC
231 West 96th Street
Professional Suites 2B3
NYC NY 10025
t: 212 566 8000
Ecf@wylielaw.com

**GIDEON ORION OLIVER**

_____

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

**COHEN&GREEN P.L.L.C.**

By: _____

Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
       remy@femmelaw.com
       jessica@femmelaw.com

75